FERD WALTHER, Appellant, v. W. H. NULL.

In Banc, March 2, 1911.*

1. **FINDING OF FACTS: Equity Suit.** The statute requiring a written finding of facts and conclusions of law, on request, pertains to actions at law and not to suits in equity. The chancellor does not commit error in refusing a written request for such findings. If made, on appeal they are only advisory, for an equity suit is for consideration anew on appeal.

2. **EQUITY: Improper Evidence.** In an equity suit rulings on evidence are of little or no controlling force on appeal, as a general rule. If improper evidence go in, the appellate court, which tries the case anew, can reject it and no harm is done; and if proper evidence is offered and excluded, and it is preserved in the record, it will be considered on appeal in reaching a just decision. But a mass of irrelevant matter tends to becloud the chancellor's mind and mar serenity of judgment.

3. ———: **Irrelevant Issues: Fraudulent Conveyance: Invalid Debt Merged in Judgment.** In a suit to set aside a deed made by a decedent as being fraudulent as to creditors, pleas by defendant that the note, which had been merged into a judgment of the probate court in favor of plaintiff, had been kept alive by spurious and feigned credits thereon, and that it was barred by limitations, have no place in the case. The judgment of the probate court is invulnerable to attack in a collateral proceeding, and can be overthrown only by a direct attack thereon for fraud in its concoction, or in the way provided by the statute (Sec. 220, R. S. 1909), by the filing by the administrator of an affidavit within four months stating that the demand has been improperly allowed; and if neither course was pursued, the judgment settled the validity of the demand of plaintiff in the suit to have the deceased grantor's deed set aside as fraudulent.

4. **FRAUDULENT CONVEYANCE: Assumption of Grantor's Debts.** Where the grantee had knowledge of the existence of plaintiff's note, which after grantor's death was merged into a judgment against his estate; and the grantee did not stand in the shoes of a preferred creditor of the grantor, paid nothing down for the conveyance, made no valid legal assumption of grantor's debts, but accepted the deed with a false recital of its consideration, which of itself is a badge of fraud, and since

---

*Note.—Decided February 9, 1911. On motion for rehearing, opinion modified by *per curiam* opinion delivered March 2, 1911.

the deed was made has paid only a mere pittance on the grantor's debts, and where the gift to the grantee stripped the grantor of all ability to pay his debt to plaintiff, and there is evidence of bad faith and fraud, the conveyance, whether intended as a fraud or not, operated as a fraud in law, and will be set aside.

*Held*, by WOODSON, J., in a dissenting opinion, that while a voluntary conveyance which renders the grantor insolvent is void as to existing creditors, yet the facts of this case show that the deed was made for a valid consideration to pay the grantor's debts and to support and maintain him, and the agreement to support being kept in good faith and the money expended for that purpose being equal to the gift, the deed should not be held to be void as to existing creditors.

5. ————: ————: Agreement for Future Support. An agreement for future support is not a sufficient consideration to support a conveyance as against existing creditors. But even though a conveyance supported by the consideration of future support of the grantor were held to be good as to existing creditors, yet where the support of the grantor no more than absorbed the rents, and the improvements and repairs were more than counterbalanced by the timber sold, that fact should not be permitted to preclude a cancellation of the deed where such consideration for support was not expressed in the deed, and if thought of at all at the time was purposely kept out of it and was at no time put in writing, and otherwise appears to be a colorable afterthought.

6. ————: Laches. Where the deed expressed a false consideration of more than the land was worth, an existing creditor residing in another State is not chargeable with laches because he rested on the good faith and honesty of the recorded deed for four years before the grantor's death, and during that time allowed the grantee to hold the title and enjoy the usufruct of the land without question.'

Appeal from Jefferson Circuit Court.—*Hon. Jos. J. Williams*, Judge.

REVERSED AND REMANDED (*with directions*).

*Kleinschmidt & Reppy* for appellant.

(1) Probate courts are courts of general jurisdiction and their judgments are conclusive in collateral proceedings. Johnson v. Beazley, 65 Mo. 250;

Vaslor v. Brock, 84 Mo. 574. (2) The allowance by the probate court of a note has the force and effect of a judgment, and the question whether it was supported by a valuable consideration cannot be raised in a subsequent suit in the circuit court. Clark v. Thias, 175 Mo. 628. (3) A voluntary conveyance by a debtor in embarrassed circumstances, or by one whom the conveyance itself renders insolvent, is fraudulent and void as to creditors. Snyder v. Free, 114 Mo. 370; Needles v. Ford, 167 Mo. 495; Shaw v. Tracy, 83 Mo. 224; Clark v. Thias, 173 Mo. 652; Walsh v. Ketchum, 84 Mo. 427; Snyder v. Free, 114 Mo. 369. (4) A conveyance for support of grantor during his lifetime is fraudulent and void against creditors. 14 Am. & Eng. Ency. Law, p. 433; Robinson v. Robards, 15 Mo. 467; Swift v. Hart, 35 Hun (N. Y.) 128; Perry v. Hardison, 99 N. C. 21. (5) Indebtedness at time of voluntary conveyance is evidence of fraud. Woodson v. Pool, 19 Mo. 340. (6) A false recital of consideration is a badge of fraud. Benne v. Schnecko, 100 Mo. 256. (7) The conveyance to a creditor with a delegation of power for him to prefer other creditors is fraudulent and void as to creditors not provided for. Seger v. Thomas, 107 Mo. 641; Harnill v. England, 57 Mo. App. 106; Oliver Finnie Grocer Co. v. Miller, 53 Mo. App. 107; Barnum v. Hemstead, 7 Paige 568. (8) Where request is made the court must make finding of facts. Young v. Stephens, 66 Mo. App. 222; Bailey v. Emerson, 87 Mo. App. 225; Kostube v. Miller, 137 Mo. 173.

*Byrns & Bean* for respondent.

(1) The failure of the court to make a finding of the facts is not reversible error in an equity case such as this; the court on appeal tries the case *de novo*. Miller v. McCaleb, 208 Mo. 572; Gaines v. Grocery Co., 107 Mo. App. 532. (2) Plaintiff, in his pe-

tition, seeks to have the deed set aside, because it was voluntary and wholly without consideration and in fraud of creditors. There is absolutely no proof to support such a charge, as it is undisputed under the evidence in this case that the deed was made for a valuable consideration. The plaintiff under his prayer for general relief can have only such relief as is consistent with his petition. McNair v. Biddle, 8 Mo. 188; Muenks v. Bunch, 90 Mo. 507; Newham v. Kenton, 79 Mo. 382; Schnider v. Patton, 175 Mo. 723; Orchard v. Bank, 121 Mo. App. 348. (3) The deed in question was made to the respondent for a valuable and adequate consideration, and there was no evidence of any fraudulent intent upon the part of either the grantor or grantee, and plaintiff's bill was properly dismissed. Jones v. Geery, 153 Mo. 476; Nichols v. Ellis, 98 Mo. 344. (4) It appears from testimony offered by plaintiff as to his claim on the note against John W. Null, Sr., that although allowed by the probate court, such allowance was procured by collusion with the administrator of said Null's estate. Plaintiff therefore has no standing in a court of conscience. He who seeks equity must do equity. Fred Walther was not a creditor of John W. Null, Sr., at the time the deed in question was made, and it was none of his concern what disposition Null made of his property. He who comes into equity must come with clean hands. Plaintiff's bill is based on the judgment of the probate court, which was procured by collusion, as shown by his own testimony. He knows the deed has been made, shortly after its execution, yet delays proceedings to collect the old note until after Null's death, Null having stated in his lifetime that the note had been paid by his taking care of plaintiff's family, a statement which plaintiff, although a witness in the case, did not deny. Such a judgment as plaintiff has procured in this case, considering the nature of the claim and the manner of its allowance, cannot be made the basis of a creditor's

bill in a court of equity. Sargent v. Salmond, 27 Me. 539. Equity views with disfavor suits brought after the death of the party whose estate is sought to be charged, where the fraud alleged is known before and suit might have been brought during the life of the party acquainted with the whole business, but without reason or excuse is delayed till after his death. Lenox v. Harrison, 88 Mo. 496; State ex rel. v. West, 68 Mo. 229; Dexter v. McDonald, 196 Mo. 399.

LAMM, J.—From a decree dismissing his creditor's bill, plaintiff on due steps comes up by appeal. The cause, once submitted in Division, came into Banc because the brethren disagreed.

Shortly, the case on the pleadings is this:

The petition is in the nature of a creditor's bill. It charges that one John W. Null in 1901, then the owner of a farm in Jefferson county, Missouri, of 362 acres, and then indebted to plaintiff on a promissory note for $478.42, conveyed said farm to defendant with the intent to hinder, delay and defraud his creditors, among them plaintiff, by a deed put of record; that the express consideration in the deed, $10,000, was false and feigned; that no consideration passed, but the conveyance was voluntary; that thereby the grantor was made wholly insolvent and stripped of ability to pay his debts; that grantor died in 1905, and his estate was in charge of the public administrator and in process of administration; that he left no landed estate and was so poor in wordly goods that his chattels were insufficient to pay funeral expenses and costs of administration; that plaintiff's said claim had been allowed by the probate court of Jefferson county for $744.10, and thereby merged into a judgment for that sum and placed in the fifth class of demands; and that, unless said real estate can be reached and subjected to such judgment, it will remain wholly unpaid.

Wherefore, a decree was prayed that the conveyance be set aside as void through fraud, and be certi-

fied to the probate court in order that the land might be dealt with there as a debt-paying asset of decedent's estate.

Defendant answered, admitting the execution of the note and deed, denying all other allegations—averring, furthermore, that he bought the land in the ordinary course of business in good faith for full value, without any knowledge of the existence of a debt to plaintiff; that if there ever was a debt, it had long since been paid and satisfied; that, moreover, it was barred by the Statute of Limitations; that if any credits appear on the note, they had been put there for the purpose of keeping it alive and were not made by decedent; that defendant, in possession of the land ever since his deed in 1901, had been to a large outlay in making permanent improvements; that plaintiff knew of defendant's purchase and acquiesced in the sale and transfer to him, in that grantor, after the transfer, lived in the village of Hematite (a village hard by the land) until his death; that plaintiff was his son-in-law and from the time of the transfer until his death made no claim on account of said note until grantor's death, either to him or defendant, nor did he ever claim or pretend to have a charge on or claim against said land until the death of grantor.

The cause was heard below at the May term, 1906, of the Jefferson Circuit Court, and the chancellor took time to consider. At the January term, 1907, he refused to make a finding of fact and state his conclusions of law on the parol request of plaintiff, but entered a bald judgment dismissing the bill—plaintiff saving his exceptions. Presently, on the same day, plaintiff filed a written request for a finding of facts and conclusions of law, stated separately, which request was refused and plaintiff excepted.

Error is assigned: *first,* on the foregoing rulings; and, *second,* on the decree, in that it was for defendant and not for plaintiff.

I. There is no substance in the first assignment. The cause, being in equity, is here for consideration anew. Therefore, the controlling question is: Did the chancellor, on the legal evidence in the record, seek equity and do it?—not whether he made a finding of fact. If he had made a finding and incorporated it into the record, its office would have been merely advisory. It would have been put, as to us, on the foot of a finding of a jury to him if he had asked one's advice on an issue of fact in an equity case. So runs the law. [Pitts v. Pitts, 201 Mo. 356.] How could plaintiff be hurt on the merits ultimately by a failure of the court below to give the upper court mere advice (whether good or bad) by way of a finding of fact and conclusions of law? It has been soundly ruled that the statute requiring a written finding of fact and conclusions of law (R. S. 1909, sec. 1972), on request, pertains to law suits and not to equity cases pure and simple. [Fitzpatrick v. Weber, 168 Mo. l. c. 572.] This ruling is grounded on the theory that in a law suit, proper, a finding of fact is of substance, it fills a due office, viz., it is in the nature of a special verdict which we may not interfere with on appeal if there be substantial evidence to support it. By and large, the point has been considered newly and fully by our learned brother GRAVES in a late case (Miller v. McCaleb, 208 Mo. 572, et seq.), and the above doctrine again promulgated on a review of the leading precedents. The student in jurisprudence, curious in that behalf, may find there such learning on the matter that it would seem to attempt to add anything of value would be to carry coal to Newcastle or owls to Athens.

We rule the point against plaintiff.

II. *Of the second assignment.*

Before disposing of the main question, that is, whether the decree did equity, there is a preliminary

matter material to a statement of the facts (which this assignment necessarily seeks) to which we pass.

(a).  The answer, *inter alia,* pleads matters going to the *bona fides* of plaintiff's debt.  It charges that the debt was outlawed.  There being certain life-giving credits on the note, it alleges, in effect, that those credits were put there for a sinister purpose to toll the Statute of Limitations, and were not genuine.  Further, it states that the debt had been paid and had gone out of existence in that way, as well as by the flux of time.  This assault in the pleadings on the standing of plaintiff as a creditor, discrediting the basis on which his right to relief rests, was followed by an elaborate attempt at the trial to prove the allegations of the answer.

At the outset plaintiff objected to this line of investigation, but his objection was overruled.  At other stages of the trial he protested against testimony tending to show that he had no debt against decedent; that it had been paid; that the credits were simulated and the Statute of Limitations had barred his claim. But his objections were ineffective and a great mass of testimony was introduced, much of it hearsay, loose talk, mere inferences, *et cetera,* having for their purpose proof of those allegations of the answer.

In an equity suit rulings on evidence are of little or no controlling force on appeal, as a general rule. That rule is founded on the doctrine that the appellate court tries such case *de novo* in a certain sense. Therefore, if improper evidence go in, we can reject it and no harm results.  If proper evidence is offered and excluded, we can consider it when preserved in the record and thus permit ourselves, sitting as a court of conscience, to reach a final and just conclusion despite rulings *nisi* on the admission of testimony.   But in a close case, or where a mass of irrelevant and pre judicial proof is allowed, we may never know what insidious effect the improper testimony had upon the

mind of the trial chancellor. Such evidence tends to create an *atmosphere* about the case inimical to judicial and intellectual robustness and serenity of judgment. It puts the discriminating powers of the chancellor to a dangerous and unnatural test. It puts an enticing and alluring color in the case that tends to seduce the mind of the chancellor aside from the main-traveled road to ultimate justice. It puts a mote in his mind's eye. It may put a question mark after his decree. This plaintiff's debt was merged in a judgment —the most sacred form of obligation known to civilized man; one buttressed by those cardinal precepts of the law that forbid a man to be vexed twice on the same cause of action; that announce it to be to the interest of all the people that a legal controversy should be set at rest once for all—in one suit, with one day in court, not *two*. The allegations of the answer we are now considering, in view of the live judgment of the probate court, each and all finally passed thereby *in rem judicatam*. They are in a sealed book, whose leaves may not be opened and turned over for investigation by a collateral attack on that judgment; for so long as it stands, it stands four-square against every wind that blows. A legal assault on such a judgment can proceed along only two roads—(1) that of direct attack by a bill in equity, charging facts constituting fraud in the very concoction of the judgment itself, or (2) by a proceeding under the statute for setting aside improper allowances against estates pending in the probate court. [R. S. 1909, sec. 220, *quod vide*.] We may not *think* (to use the phrase of a wise judge) behind the judgment when we dare not *go* behind the judgment. To think where we dare not go, is by *innuendo* to *hoot* a man out of his rights.

We need not say whether the proper parties were before the court to set aside the judgment of allowance for fraud, because a proposition dispositive of the case on that head is that there are no allegations whatever

in this answer charging fraud in its concoction. No facts constituting fraud are alleged and no issue of that sort was raised, and, therefore, no evidence of that kind was admissible. By section 220, supra, if a litigant does not desire to go into equity to set a judgment aside on the only grounds permitted by equity rules, viz., fraud in its very concoction, by which is meant fraud arising on extrinsic and collateral matters and not on the very issues presented in the pleadings and passed upon at the trial (Howard v. Scott, 225 Mo. l. c. 713, *et seq.*), he may choose the statutory method, there marked out, viz.: Any executor, administrator, heir or creditor, within four months after an allowance of a demand, may file in the office of the probate court the affidavit of himself or some credible person, stating that affiant has good reason to believe and does believe that such demand has been improperly allowed and shall furnish satisfactory evidence of that kind to the court, having given due notice to the opposite party, whereupon the court shall vacate the order of allowance and try the matter anew. That course was not pursued, although at the time this suit was brought, to-wit, in time for trial at the May term, 1906, we take it the four months allowed by that statute for such application, had not then run. But whether the time had run or not, defendant had still left another arrow in his quiver, a suit in equity to annul the judgment. [Fitzpatrick v. Stevens, 114 Mo. App. 497.] These statutory remedies, absent preclusive words, do not oust the ancient jurisdiction of courts of chancery. [Arnett v. Williams, 226 Mo. l. c. 118, *et seq.*] A probate court has jurisdiction to allow claims against estates of dead men and to marshal their assets; hence a judgment rendered allowing the claim and assigning it to a class is as impregnable to attack, collaterally, as a judgment of a superior court. Those rules of law that clothe the one with a warm

frock of protection clothe the other, and the very point up has been so ruled. [Clark v. Thias, 173 Mo. 628; see, also, Johnson v. Beazley, 65 Mo. 250; Desloge v. Tucker, 196 Mo. l. c. 601.]

On such premises, we hold the mass of evidence tending to prove those allegations of the answer under discussion had no place in the case. Therefore, we pass to the pertinent facts, omitting such irrelevant matter.

(b). The facts, summarized, are these:

John W. Null, an old man, on the 2d day of October, 1901, owned the land in question, a farm of 362 acres close by the village of Hematite in the county of Jefferson. His wife died in 1900 and he had no homestead or other exemption, as against creditors. On that day he conveyed the land by a warranty deed to defendant, his grandson, and within two months the deed was spread of record in the office of the recorder of deeds of that county. Among others, it contains the following recitals: ". . . that the said party of the first part, in consideration of the sum of ten thousand dollars, to him paid by the said party of the second part, the receipt of which is hereby acknowledged, does by these presents grant," etc.; and this, in the habendum clause: "Subject to a deed of trust of $2500 dated July 12, 1900, given to Theodore Walther." The grantee was a young man, unmarried, about 23 years old, of no settled employment, partly depending on odd jobs of manual labor to get on in the world and partly on his father, Dr. Null, with whom he resided as a member of his family in St. Louis; and the grantor, the father of Dr. Null, also lived with the Doctor at the time. Grantee ha dno means worth while. Not a dollar of that express consideration was paid at the time or was intended to be paid, and the recital in the deed to that effect was false. The case is put to us by defendant on the theory the consideration mentioned was not the true one, but that there was another, presently to be considered. Defendant was not present

when the deed was drawn and acknowledged. The grandfather, grantor, dictated the recitals to the scrivener and the grandson afterward accepted the deed in its complete form. However, the idea of a swollen and simulated consideration for "speculative purposes" had been suggested by the grandson to the grandfather in prior conversations in the family and the deed was written with a feigned and swollen consideration at the grandson's instance. Grantor left a family of children of mature years, and plaintiff was his son-in-law, married to one of them bearing the fireside name of "Lou." Grantor died in 1905. Plaintiff was a miller by trade and for several years before grantor's death had resided continuously in Indiana, plying his trade. During that time he had not resided in Missouri, but had made visits to his wife's people—one at the death of his mother-in-law in 1900, one during the World's Fair, and one when his father-in-law died in 1905. The record shows he was out of touch with the Null family affairs, was a stranger to the negotiations leading up to the conveyance questioned, and was not consulted about them. All he knew at the time was from casually reading in a Jefferson county paper an item of local news, noting the record of the deed and its purported consideration of $10,000. At that time he held a live note against grantor, which, after grantor's death, was merged in a judgment of allowance by the probate court of Jefferson county for $744.10, and which is in full vigor and wholly unpaid. There is persuasive testimony tending to show that Dr. Null in 1899, because of old age and business complications, took charge of grantor's affairs as his adviser and business manager. Just when he ceased to fill the confidential office of such adviser and manager is not clear. From the time the deed was made in 1901 until 1903, grantor resided with Dr. Null as a member of his family in St. Louis. There is inferential testimony that he continued to supervise grantor's affairs after the deed was made. Be that as

it may, it was publicly known and recognized on all sides that grantor's affairs were in a bad way; that he was not managing them; and that the Doctor had taken charge. In the line of that duty he hovered over the negotiations leading up to the deed in question; took an active part in bringing about the conveyance and continued thereafter apparently with grantor's consent to supervise his affairs and speak for him in the matter of paying his debts. At the time of the conveyance and long before, it is of significance that Dr. Null well knew of the existence of plaintiff's note as outstanding, and, what is more to the point, defendant himself knew of it. The allegations in his answer to the contrary are not sustained by the record. By the conveyance grantor beggared himself as to his creditors. This land was his only debt-paying asset. He still owned a trifle of personal property, which he died possessed of, appraised at $34 and some cents, and knocked down for a dollar or two the rise of that by public vendue at the administrator's sale. We infer plaintiff is a man of modest means. He had a brother, Theodore, living in the neighborhood of Hematite. A year or more before the conveyance to defendant, Theodore and Dr. Null were either jointly interested in a plan for selling this land for $10,000 to some mine promoters and exploiters, or else the plan was Dr. Null's, and was being developed with Theodore's knowledge. The scheme advanced to the stage that a deed was put in escrow for delivery on the payment of $10,000. But that plan flashed in the pan and was abandoned. During its pendency, Theodore had custody of plaintiff's note for collection, and as near as we can gather this note was to be paid out of the proceeds if the deal had been consummated. Theodore, it seems, retained possession of the note. He had nothing whatever to do with the transfer to the grandson and had no notice of its true considerations or aims, except from the record of the deed after it was an ac-

complished fact. The testimony satisfies me that while plaintiff took no "legal" steps to collect the note, yet he desired Theodore, either before, after or during the pendency of the abandoned plan, to talk to grantor, the maker of the note, about paying it, and was assured by him that he need not "worry," that the note would be paid. After the deed to the defendant, Theodore called Dr. Null's attention to the note as the manager of his father's affairs, and the Doctor assumed to say the money would have to be borrowed to pay it and that as he was taking care of the business now, "Ferd don't need to worry about it, I will see it is paid." At another conversation later, he spoke to Theodore to the same effect. The disclosures of the record are of such a sort that the case may be taken as submitted on the theory that Theodore did not "want to sue the old gentleman" and did nothing more towards collecting the paper. In 1903 the grandfather ceased to live in the family of his son, Dr. Null, in St. Louis, and, as said, came to Hematite and resided there for two years, until he died. When plaintiff came to his funeral, estate matters were brought up by Dr. Null. He suggested that plaintiff help himself to the few personal effects of decedent. Plaintiff declined to do that and wanted to know what had become of the $10,000 consideration paid for the land, which, deducting the deed of trust it was subject to, would leave $7500. He was told by Dr. Null that no $10,000 was paid, that "one dollar would make the sale legal." The question of paying plaintiff's note was then broached, and the Doctor said: "When Will (meaning thereby, defendant) makes a sale he will *donate* you something, or to Lou." The theory of a donation was repudiated by plaintiff with some heat, and the next step was the appointment of an administrator, the merging of the claim into a judgment, and finally the bringing of this suit to open the conveyance and let in plaintiff as a creditor.

As to the value of the land the evidence is in conflict, as usual, where estimates are indulged. About sixty acres is bottom plow land, worth forty dollars per acre for farming purposes. We infer the rest of it is upland, somewhat broken; some of it, say, thirty acres, in cultivation; some of it fit only for pasture; and from some of it the timber had been cut and sold, but whether it could be cleared and broken for the plow is dark. The estimates of the witnesses vary from $3500 to $8000. There are traces in the evidence that it was a likely farm for a dairyman. It had a fine spring, but poor improvements in fences, houses and outbuildings. It lies close to a railroad shipping point. Before, at and since the conveyance the farm rated as mineral land, was thought to have mineral, lies, we take it, in a mineral belt, had been prospected for lead and the show for mineral added to its prospective value. Ever since his deed defendant has held the farm at not less than $10,000, and had been asking $60,000. Prior to the conveyance a real estate firm in St. Louis for three years had it on their books for sale at $4000. Doing the best we can, by striking an average, we put its reasonable actual value at, say, $5500.

In the year 1900 John W. Null borrowed $2500 on his farm and paid the bulk of his debts. In that year, or the next, he sold $600 of timber off the land, which went the same way. We think it satisfactorily shown that at that time he had no other outstanding obligations, except to his son, Dr. Null, to his granddaughter, Izella Null, and to plaintiff. The answer alleges, and defendant's own testimony tends to show, that he put some improvements on the land, chiefly in the way of fences and repairs on the house—the latter, to the extent of $80. He had rented the land at $300 a year and got $200 from the sale of timber, say, $1400 in all up to grantor's death. We are not impressed with the extent of these improvements and conclude from the testimony that the sale of the timber more than paid

for them.  Dr. Null testified that the betterment to the house, a new roof, was paid out of grantor's own money.  There is testimony indicating that it was expected that the farm would be sold to mineral prospectors, that the conveyance to the grandson was for that purpose, and that the large consideration was put in the deed as a lure to such a sale.  At once grantee organized a mining corporation, the Joachim Lead Company (named after a creek that meanders through the farm), with a capital stock of $500,000.  We take it, its capital stock was also fictitious, that it was a mere paper corporation, and that its chief or only asset was a mineral lease, running for a term of one year and a half, on the land in question.

There is a hard and flippant note running through some of the testimony on behalf of defendant, not calculated to impress a court of conscience favorably.  For example:  His main witness, and the chief actor in this whole matter, his father, on cross-examination testified in part:

"Q.  How much did you capitalize that corporation at?  A.  Five hundred thousand dollars.

"Q.  And the farm is worth only four thousand dollars?  A.  Yes, sir.  But that don't make any difference, if you can get a sucker on your line and sell it to him for that amount.

"Q.  You have been after suckers, have you?  A.  Generally.  I haven't a gentleman talking to me now, that I know of.

"Q.  Do you think I am a sucker, what makes you think so?  A.  Because you look it and smell like it."

To sustain the allegations in his answer that he bought the land in good faith and for full value, defendant was permitted to show that, instead of the cash consideration recited in the deed, the estimate of value between him and his grandfather was $4000; that it was assumed between them, though not so narrated in the deed, that he would pay off the $2500

deed of trust; that his grandfather owed $100 to his granddaughter, Izella, and about $260 to his son, Dr. Null, and as part of the consideration defendant "assumed," verbally, to pay these debts; and that he also agreed to support his grandfather during his lifetime. He introduced testimony tending to show he performed the latter agreement. Whether he performed it while his grandfather was living with Dr. Null in St. Louis, is hard to make out in the fog of the record, but after the grandfather moved to Hematite in 1903 up to his death in 1905, defendant testified he supplied his grandfather with food, raiment, etc., and a house to live in at an outlay of $25 per month and buried him at a cost of $65 or $75. There was some loose talk in the presence of the scrivener at the time the deed was drawn relating to debts, but taking the scrivener's examination in chief with his cross-examination, we can make little out of it. There was no written assumption of any debt whatever and no written assumption of the support of the grandfather during his lifetime. If we construe the scrivener's testimony correctly, the agreement to support was not mentioned and the assumption of debts was purposely omitted from the deed. These several agreements, thus resting in parol, were to all intents and purposes a secret family arrangement of which the world at large and the neighbors at Hematite knew nothing. There is nothing to show that Theodore or Ferd Walther ever heard of such an arrangement until the disclosures of the trial.

The case is submitted on the confessed fact that defendant had paid his cousin, Izella, only $10.75 on her debt of $100. He made an arrangement with his father to turn over stock in the $500,000 mining corporation in payment of his debt, and, although the father still retains the original obligation, he has the stock and is satisfied with it. It creeps into the case that defendant had paid off the $2500 deed of trust by making a new loan.

The question is: Did the judgment entered below do equity in the light of such a record? We think not, because:

Assuming, as we do, that plaintiff's judgment is not open to collateral attack, then this case must be disposed of on the theory he was a creditor of John W. Null at the time of the conveyance to his grandson and at the time of his death. We see no possible way to escape the conclusion that full force and vigor must be given to that judgment, as already ruled, and this conclusion carries with it another proposition, viz., that the conveyance in question, whether intended as a fraud or not, operated as a fraud in law as to existing creditors under the peculiar facts found to exist in the case at bar; for defendant had knowledge of plaintiff's claim, he did not stand in the shoes of a preferred creditor of his grandfather, he paid nothing down, he made no valid legal assumption of the debts to his father and his cousin, he accepted a deed with a false consideration, itself a badge of fraud. In view of the fact that in five years he paid his cousin, Izella, a mere pittance and paid his father in chips and whetstones, the whole transaction seems colorable, unnatural and an afterthought. This view of it is fortified by the fact that no writing was entered into binding the grandson to support his grandfather, and the whole arrangement was kept a family secret and withheld from plaintiff and the world at large until the trial. At $25 per month the support of the grandfather would merely absorb the current rents of the land, $300 per year—a singular coincidence—so that if we were to hold that a conveyance, supported by the consideration of the future support of the grantor, would be good as to existing creditors, yet in this case defendant is out nothing, either for support or for repairs. The income of the farm and the timber sold made one hand wash the other, and the result of the conveyance is plainly a gift of the equity in the land. The maxims are that

one must be just before he is generous, that clandestine gifts are looked on with suspicion.

But we are not willing to rule that an agreement for future support is a consideration sufficient to support a conveyance as against existing creditors. Such ruling would be tantamount to holding that an owner could cover or tie up his property, take it from his creditors and subject it to his own use—a doctrine we cannot subscribe to.

The homestead and other statutory exemptions are forbidden fruit to the creditor. He may neither pluck nor eat thereof. This results from a statutory change in the policy of our law taking such specific exemptions out of the general property rule, viz., that the owner or those upon whom descent is cast holds property subject to the payment of debts. If a man owe nothing, he may do with his property as he pleases to do, so long as his disposition of it does not contravene good morals or fly in the face of settled public policy. It will be time enough for the courts to rule that property may be conveyed away from existing creditors on a consideration for future support, secret or otherwise, when by constitutional or other valid enactment that disposition of property is permitted.

The case of Jones v. Geery, 153 Mo. 476, is relied on as authority to the contrary. That case is scantily reported and there are remarks, *arguendo,* made in the course of the opinion that might give color to defendant's contention, but in that case there were equitable features quite absent from the case at bar. Not only so, but the main proposition ruled by the court, on which that case must rest as a sound judgment, is that the evidence showed there was no gift whatever and that, absent fraud, the grantor sold his farm to his sons at a reasonable value in order to pay his debts, which they had done. That case does not rule that an agreement for future support is such a consideration as will alone support a conveyance against the rights

of existing creditors. Observe, in that case there was no actual fraud. The creditor, a son-in-law, was not able to buy the land. We infer from that finding that the option had been open to him to take the land on the terms the sons afterwards took it. At any rate, the son-in-law had knowledge of the whole transaction and the true consideration, and with such knowledge stood by and saw the sons take it at a reasonable value, viz., the amount of certain outstanding debts. Observe further, these debts were of a character that threatened at once to sweep away the property. The son-in-law, armed with full knowledge, saw the debts paid by the sons and the contract for support put in force without protest and under circumstances indicating acquiescence. Not only so, but at that very time this son-in-law had in his hands more money of his father-in-law's than would have paid his own debt. After the conveyance, he voluntarily paid it over to the old gentleman. On such circumstances this court concluded plaintiff's suit was an ''afterthought;'' that the object of it was to upset a settlement he had acquiesced in. That course did not commend itself to this court as in accordance with equity and good conscience. We have no bone to pick with that decision when properly analyzed and restricted to the facts held in judgment. Illustrations and remarks, *arguendo,* in the course of a decision may be persuasive, but are not of the essence of a holding. In determining what a court actually holds, the facts in judgment must be kept in mind.

In the case at bar there is evidence of a gift of a substantial amount—a gift stripping the grandfather of all ability to pay his debt to plaintiff. Furthermore, there is evidence of bad faith and fraud, and defendant is impaled on the horns of a dilemma; for either proposition invalidates the conveyance.

It was argued at our bar and in the brief of defendant's learned counsel, that the delay of plaintiff to press his claim in the lifetime of his father-in-law

and in allowing defendant to hold the title for four years without question, creates an equitable bar to a decree in his favor. The argument is somewhat elusive and difficult to classify. The best we can make of it is a plea of laches or possible estoppel. If plaintiff had resided in the neighborhood and had not been misled by the swollen and false consideration in the deed and tolled on by promises that his claim would be settled; if he had had full knowledge of the fact that certain debts were assumed by the grantee and that the support of the grandfather had been assumed, and, so knowing, had seen and acquiesced in defendant's taking possession and making improvements on the farm and supporting the grandfather, thereby changing his condition with reference to it to his detriment—we say if such things were true and plaintiff had remained silent, lifting no finger and making no claim, then we do not say that estoppel would arise; but it might arise and we might have a different case to deal with. Laches is an equitable doctrine applied independently of the Statute of Limitations to assist in reaching an equitable result. But here there are no laches. We are not willing to rule that a son-in-law residing in a distant State may not rest, as this one did for a spell, on the good faith and honesty of a deed made by his father in-law and spread of record, nor are we willing to rule that he is obliged to briskly sue him, and crowd him to the wall, in order to escape a charge of laches. If that were the law, it would be a hard saying, much murmured against. It is not clear how either justice or the amenities of life would prosper through such a doctrine. It is bad form for the defendant to plead mere laches, in view of the fact that he concealed the true consideration of the deed and the secret family arrangement from his relative. Defendant is hurt only in anticipation, not in pocket. There is no danger that plaintiff's claim will be superior to the mortgage put on the land to pay the former mortgage.

The premises considered, the judgment was for the wrong party.  Accordingly, it is reversed and the cause is remanded with directions that the circuit court enter a decree finding the issues for plaintiff and annulling the deed from John W. Null to defendant, and certify the decree to the probate court.

*Graves, Kennish, Ferriss* and *Brown, JJ.,* concur; *Woodson, J.,* dissents in opinion filed; *Valliant, C. J.,* absent.

## ON MOTION TO MODIFY JUDGMENT.

PER CURIAM.—Respondent files a motion to modify the directions given the lower court.  It is sustained in part.  The last paragraph of the opinion is stricken out, and the following is made the concluding paragraph in lieu thereof, viz.:

The premises considered, the judgment was for the wrong party.  Accordingly, it is reversed and the cause is remanded with the following directions:  The circuit court shall enter a decree finding the issues for plaintiff and annulling the deed (describing it) from John W. Null to defendant as to the claim of this plaintiff, including interest thereon, and as to the costs of this proceeding and that of administration in the probate court.  The court is further directed to take an accounting of the amount of the allowance in the probate court in favor of plaintiff, principal and interest, and decree a lien therefor in favor of plaintiff against the land (describing it) conveyed by the deed of said Null to defendant, and for all costs in this proceeding, the cost of administration to date to be ascertained and also made a lien.  The court also shall decree the foreclosure and enforcement of said lien, and the land must be ordered sold to satisfy the same.  Defendant to have a reasonable time to pay off and satisfy the lien, not to exceed four months, with stay of execution to the date given for payment. If the amount

of said lien be paid to the clerk of the circuit court on or before said date, then the judgment shall be satisfied. If not so satisfied, special execution shall issue and the land be sold as in due statutory course of sheriffs' sales of real estate.

## DISSENTING OPINION.

WOODSON, J.—This cause, having been transferred to Court in Banc and reargued, was assigned to LAMM, J., to write the opinion therein.

After having seen, read and considered his opinion, I dissent therefrom and adhere to the views expressed by me in my divisional opinion, which is as follows:

This is a bill in equity, instituted in the circuit court of Jefferson county by the plaintiff against the defendant, to set aside and cancel a certain warranty deed, conveying to the latter three hundred and sixty-two acres of land, situated in said county, particularly described in the petition, for the alleged reason that it was executed by John W. Null, Sr., and accepted by defendant, John W. Null, Jr., in fraud of the former creditors.

A trial was had before the chancellor, and the findings of fact and decree of the court were for the defendant, and the plaintiff duly appealed to this court. The following facts are undisputed:

John W. Null, Sr., owned the land in controversy and resided upon it. He departed this life on October 24, 1905, at the age of eighty years. The defendant was a grandson of the deceased. Dr. W. H. Null was a son of the latter, and the father of the defendant. The plaintiff was a son-in-law of John W. Null, Sr., having many years previous to the transactions here involved married Lou Null, his daughter.

The deed of conveyance assailed by this proceeding was executed October 2, 1901, for the expressed

consideration of ten thousand dollars, and was promptly and duly recorded in the office of the recorder of deeds of said county.

On July 19, 1892, John W. Null, Sr., and one J. F. Null executed to plaintiff their joint and several promissory note for the sum of $478.42, due twelve months after date, bearing eight per cent interest per annum. Various payments were made on the note at different dates by J. F. Null, the last the 13th day of November, 1896. This note was presented to the probate court of Jefferson county for allowance against the estate of John W. Null, Sr., deceased, and on December 23, 1905, said note was allowed for the sum of $744.10, and assigned to the fifth class.

Prior to the death of John W. Null, Sr., to-wit, in the year 1900, he borrowed of the plaintiff's brother, Theodore Walther, the additional sum of $2500 with which to pay his debts, gave his promissory note therefor and secured the same by a deed of trust on the land involved in this case.

In addition to the indebtedness before mentioned, John W. Null, Sr., at the time of the execution of the deed to defendant, was indebted to his son, Dr. W. H. Null, in the sum of $260, evidenced by two promissory notes, and to Izella Null, his niece, in the sum of about $90, also evidenced by a promissory note.

At the date of his death John W. Null, Sr., owned but little of this world's goods, which was inventoried and appraised, as shown by the records of the probate court, at $34.35.

The plaintiff's evidence tended to show that the land in controversy was worth $6000 at the date of the conveyance, and that defendant paid John W. Null, Sr., no consideration whatever therefor.

The evidence introduced by the defendant tended to show that the land in question was not worth more than $3500, or $4000 at most, at the time it was conveyed to him; that John W. Null, Sr., had for several

years prior to this conveyance endeavored to sell it for those figures, but was unable to secure a purchaser. That he was old and infirm, and had no one to support and take care of him. That shortly prior to the time the conveyance was made to defendant, said John W. Null, Sr., offered to convey the land in controversy to his son, Dr. W. H. Null, in consideration that he would assume the $2500 deed of trust thereon due the plaintiff, release him from the $260 he owed him, Dr. Null, and assume the $90 he owed his niece, Izella Null, and support him during the remainder of his life. That offer Dr. Null refused. That shortly thereafter he made substantially, the same proposition to the defendant; and that after consultation with his father, Dr. Null, he accepted the same, that is, upon these terms. They valued the land at $4000, which was covered by a deed of trust securing the note before mentioned for $2500; that he assumed the payment of the $260 due his father, and the $90 due his cousin, Izella Null, and agreed to support his grandfather, John W. Null, Sr., during the remainder of his life, but not assuming the $2500 deed of trust, but agreed, however, to accept the conveyance of the land subject to said deed of trust. That the $10,000 consideration expressed in the deed was agreed upon and inserted in the deed so as to assist the defendant in speculating with the land. That in pursuance to that agreement the deed was executed and delivered, and that defendant immediately undertook to and did support and maintain the grantor from the date of the deed to the date of his death, which was a few days over four years, at a cost of about $25 per month. That at the same time defendant took possession of the land, made some valuable and lasting improvements thereon, namely, placed a new roof on the house and new fences practically around the entire farm, and leased it for a rental of three hundred dollars per annum. That subsequently he paid on the Izella Null note $10.75;

and paid off the notes for $260 due his father in stocks in a corporation organized by the defendant. That at all times the plaintiff had personal knowledge of the conveyance to defendant and the terms upon which it was made, and that he was supporting the grantor in pursuance thereof. That notwithstanding that knowledge, plaintiff took no steps to collect the note presented and allowed by the probate court from John W. Null, Sr., during his lifetime, and then not until he presented it to the probate court for allowance.

The defendant's evidence also tended to show that John W. Null, Sr., had subsequently to the execution of the note by him and J. F. Null to plaintiff, during the latter's financial stress, supported and clothed his wife and two sons almost two years, and that he considered and repeatedly stated that said support and clothing had more than satisfied the note, the same being the note allowed by the probate court; and for that reason that plaintiff never attempted to collect it of John W. Null, Sr., during his lifetime.

The plaintiff in rebuttal introduced evidence tending to show that prior to John W. Null's death he sent the note to some relative in Jefferson county for collection; but it seems that no further steps were taken in that direction. Also that plaintiff knew nothing of the terms upon which the land was conveyed to defendant.

I. While there was no objection made to the introduction of the evidence by respondent tending to show that the note allowed by the probate court had been paid by John W. Null, Sr., by the support and clothing of the appellant's wife and children, nevertheless it is insisted here that since the note was allowed by the probate court, it passed into judgment, which cannot be questioned in this collateral proceeding.

The pleadings in this case do not assail the validity of the judgment of the probate court for fraud or otherwise, but simply allege that the note had been paid by John W. Null, Sr., during his lifetime.

Not stopping to discuss the law which would have governed the case had the pleadings charged the procuring of the judgment by fraud, we will proceed directly to the discussion of the question, can that judgment be successfully assailed in this, a collateral proceeding? Clearly not.

This identical question was presented to this court in the case of Clark v. Thias, 173 Mo. 628. Our late lamented brother, Judge Fox, in the discussion of that question, in speaking for the court, on page 643, said: "The first contention of the appellants is, that the court committed error in striking out that portion of the answer which alleged that the note executed by Mary Larkin was executed without any consideration whatever. This proceeding is not an action upon the note to the end of reducing it to a judgment; but the suit is to cancel, and set aside a certain conveyance executed by Mary Larkin; and it is alleged in the petition, and it is admitted that this note was duly allowed in the probate court of Franklin county. If the position taken by appellants is to be maintained, the effect of this answer is to go behind this judgment and show that the note was without any consideration, and thereby destroy the force and power of the judgment rendered. This contention must be ruled against appellants. The allowance of this note by the probate court has the force and effect of a judgment."

II.   The next insistence is, that a voluntary conveyance without consideration made by a debtor in embarrassed circumstances, or by one whom the conveyance itself renders insolvent, is fraudulent and void as to existing creditors. Numerous authorities are cited in support of that proposition.

As an abstract legal proposition we suppose no one will question its soundness, but in its application to the case at bar counsel for appellant has totally ignored all the evidence introduced by the respondent tending to show that he purchased the land in controversy in good faith and paid therefor an adequate consideration.

That evidence tended to show the land was not worth over $4000; that it was conveyed to respondent subject to a $2500 deed of trust. That left the equity in the land worth only $1500. In consideration of that equity the respondent, the evidence tended to show, assumed the payment of three promissory notes which were owing by the grantor, amounting to $350, and agreed to support him the remainder of his life, which was reasonably worth $300 a year, and that he lived something over four years after executing the conveyance to respondent, which at $300 a year amounted to $1200; and if we add to that the debts assumed by the respondent it shows that the equity in the land above mentioned actually cost respondent $1550, or fifty dollars more than it was actually worth. In addition to that, the grantor might have lived much longer, which chance respondent assumed when he accepted the conveyance under the agreement; and had he done so, it would have cost him more. According to appellant's own evidence, there can be no serious doubt but what respondent supported the grantor from the date of the deed to the date of his death, four years. We say this, for the reason that his evidence shows that the grantor had no other property at the time of the conveyance, and the record is totally barren of any evidence tending to show that he was supported by any one else, except the respondent.

The case of Jones v. Geery, 153 Mo. 476, is more like this case in both law and fact than any two cases my attention has been called to during my thirty-five years' experience at the bench and bar. In the case

GANTT, P. J., in speaking for the court, on page 477, said:

"The farm involved is variously estimated to be worth from $3000 to $4000.

"Robert Geery, the grantor, was an old man in his eighty-fifth year. When an old man and a widower, he married a second time and conveyed his farm to his second wife and her children. They afterwards separated and he brought suit to set aside his deed and that action resulted in setting aside the deed, but giving the wife judgment for $1300. Attorney's fees and other charges swelled the total of the old gentleman's indebtedness to about $2300. At the solicitation of the old man's counsel, his two sons, Andrew and Robert, Jr., were induced to assume his indebtedness and undertake to provide for his support the remainder of his life, and upon these terms he conveyed the land to them. They borrowed enough on the land to liquidate his debts above mentioned and paid them. Thereafter the plaintiff, who is a son-in-law, brought suit against the old man and recovered judgment for $250 for board alleged to have been furnished the old man, and now seeks to have the deed set aside as voluntary, and the farm subjected to the payment of said judgment for board. The circuit court found for defendant, and plaintiff appeals.

"There is no pretense whatever that the conveyance was the result of any actual fraud. Indeed, it appears that it was executed with the knowledge of plaintiff and if not with his full consent certainly without any objection at the time. Nor is the claim made that it was a voluntary conveyance, but only that it was partially so.

"The proposition is that as the proof shows the farm to be worth $3000, there was a gift of $700 by Robert Geery, Sr., to his sons Andrew and Robert, that being the difference between the $2300 of debts they assumed and paid and the value of the farm.

These figures however ignore the further undertaking of the sons to support and care for their father the remainder of his life. The value of such services plaintiff has fixed at $250 a year. At that rate it will not take many years to absorb the supposed difference.

"As a matter of fact, however, there is no evidence of a gift. Robert Geery, Sr., in the absence of fraud had a right to sell his farm to his sons in order to pay his debts, and if the price agreed upon was not grossly inadequate, the good faith of the transaction is not open to an attack like this. It appears that plaintiff was not able to buy the farm, but is not satisfied with the trade the old gentleman made for himself.

"Plaintiff testifies that he voluntarily paid over to the old man $285 which he had been keeping for him, after the deed was made to the sons.

"Plaintiff's effort to set aside this deed under all the evidence smacks strongly of an afterthought, and does not commend itself to the conscience of a court of equity.

"We see no reason for interfering with the conclusion of the circuit court, and its judgment is affirmed."

In the case at bar, independent of the agreement to support the grantor for life, the trial court was warranted in finding that the conveyance was based upon a sufficient consideration, especially in view of the bill which charges that the deed as executed was voluntary and wholly without consideration and in fraud of creditors.

There is absolutely no evidence whatever contained in this record which tends remotely to show that there was any actual or intentional fraud perpetrated upon any one by the grantor or grantee in this transaction. Both of them believed the note probated had been discharged by the support the grantor had furnished to the wife and children of appellant; and

in order to pay the rest of his debts, the grantor borrowed an additional $2500 from the appellant's brother, Theodore Walther, which was used for that purpose; but instead of paying all of the debts there was left unpaid the $260 due Dr. Null and $90 due Izella Null, his son and niece. And in order to pay them, and to provide for his support and care in old age, he executed the conveyance in question. Instead of trying to defraud his creditors, the evidence shows he was at all times doing all in his power to pay all of them in full; and doubtless to his dying day he thought he had done so.

The chancellor found there was no fraud and dismissed the bill for want of equity. In our opinion that finding was well supported by the evidence; and under the pleadings and evidence, we are unable to see how he could have done otherwise. This court in such cases will defer largely to the findings of the trial court. [Huffman v. Huffman, 217 Mo. 182; Miller v. McCaleb, 208 Mo. 1. c. 573.]

III. It is finally insisted by counsel for appellant, that the chancellor erred in refusing to make special findings of fact and giving separate conclusions of law, although requested to do so. This question was expressly passed upon by this court in the case of Blount v. Spratt, 113 Mo. 1. c. 53, and affirmed in Miller v. McCaleb, 208 Mo. 1. c. 573. It was there held that such refusal was not reversible error.

Finding no error in the record, the judgment should be affirmed; and it is so ordered. *Valliant, J.*, concurred in Division; *Lamm* and *Graves, JJ.*, dissented.