PLATTE VALLEY BANK OF COSBY, RESPONDENT, v. THE FARMERS AND TRADERS BANK, APPELLANT.*

Kansas City Court of Appeals.  July 9, 1928.

*Corpus Juris-Cyc. References: Appeal and Error, 3 CJ, section 708, p. 786, n. 75; 4CJ, section 2867, p. 897, n. 81; section 2948, p. 964, n. 82; Equity, 21CJ, section 27, p. 50, n. 31; Mortgages, 41CJ, section 1494, p. 1031, n. 60; section 1497, p. 1033, n. 88; Trial, 38 Cyc, p. 1980, n. 54.

*Randolph & Randolph* for respondents.

*Culver, Phillip & Voorhees* for appellant.

WILLIAMSON, S. J.—This is a suit in equity. It grows out of the following facts. Mrs. Amelia H. Eiman was the owner of two lots in St. Joseph, Missouri, upon which there were two dwelling houses and three deeds of trust. The first deed of trust secured a note for $3000; the second secured a note for $150, and the third secured a note for $1140. Mrs. Eiman was personally bound on all three of these notes. In addition she owed the Farmers & Traders Bank, appellant-defendant here, the sum of $2800, evidenced by an unsecured note for that sum. Mrs. Eisman was insolvent. The real estate in question was worth about $6500.

In this state of affairs, appellant began negotiations with Mrs. Eiman concerning its unsecured note against her, and these negotiations ended in her deeding the real estate above mentioned to the bank and taking up the $2800 note. This deed recited a consideration of "one dollar and other valuable considerations," and contained a further provision .that: "This deed is made subject to all encumbrances of record." All of the encumbrances above named were then of record. At this time Earley D. Bird was a stockholder, director and member of the discount board of the appellant bank, and occupied adjoining and inter-communicating offices with Mr. J. B. Shackelford, special counsel for appellant. Shortly thereafter, Mr. Bird, with funds provided by himself, purchased the notes secured by the first and second deeds of trust above mentioned and sold the land under a foreclosure proceeding. Bird and C. O. Cornelius, president of appellant bank, were present at the sale. The grounds for foreclosure were that interest on the first mortgage note and certain taxes had been allowed to become delinquent. Appellant, at the time of the foreclosure sale, was the owner of the real

estate in question, subject to the lien of these three deeds of trust. After this sale Mr. Bird borrowed $2000 upon each of the two houses and lots, securing the same by separate deeds of trust. About ten days thereafter, Mr. Bird, by quit-claim deed, conveyed the lands in question to appellant, subject to the two deeds of trust of $2000 each, for an expressed consideration of one dollar. Some time before the appellant obtained the deed from Mrs. Eiman as above set forth, the plaintiff-respondent, the Platte Valley Bank of Cosby, had loaned Mrs. Eiman $1140 which was secured by the third deed of trust above mentioned. It appears that the last-named bank did not know of the transactions above set forth with reference to the foreclosure of the first deed of trust, and subsequent transfers affecting the land in question, until after the appellant had obtained the quit-claim deed from Bird. Upon learning these facts, the Platte Valley Bank brought this suit making the Farmers & Traders Bank and Earley D. Bird, only, parties defendant. Omitting formal allegations, the petition, in substance, avers Mrs. Eiman's ownership of the land in question; the existence of the first and third deeds of trust thereon, and the transfer of the land by Mrs. Eiman to appellant in payment of her note to it in the sum of $2800 and ''so that they should have the equity in said property to apply on said indebtedness.'' That equity, as the petition shows, was Mrs. Eiman's interest in the property after the payment of all encumbrances of record, a description which *included respondent's claim*. The petition further charges that appellant and Bird ''for the purpose of evading payment for said property as agreed by them with the said Amelia H. Eiman,'' bought the note secured by the first deed of trust and foreclosed it; that Bird bought the property at the foreclosure sale for $300, received a deed therefor and ''held the same for the use and benefit of'' appellant, and later conveyed the property to appellant; that respondent had no notice of these proceedings until some time after the foreclosure sale, and that appellant and Bird ''well understood that it was the intention of the said Amelia H. Eiman to convey to them only the equity in said real estate and that it was her intention that they should pay off and discharge'' the third note above mentioned. There are further averments in the petition, but they do not seem material here. The prayer of the petition was that the foreclosure sale be set aside, or, if that could not be done, then that the court should ''render such money judgment as shall be proper'' and grant all other proper relief. The answer was a general denial. The trial court refused to set aside the foreclosure sale, because the rights of innocent third persons; to-wit, the holders of the two $2000 deeds of trust executed by Mr. Bird, had intervened, and also because the appellant had sold one of the houses and lots to an innocent purchaser, but did render a money-judgment in favor of respondent and against appellant bank for $1287.90, the amount of the $1140 note, including interest, and adjudged the same

to be a lien upon the house and lot which appellant still owned. From that judgment this appeal was prosecuted to this court. This case was transferred to the Supreme Court upon the ground that title to real estate was involved, but was returned to this court for decision. The two sitting judges of this court were unable to agree in judgment, and on account of the illness of the third judge, the writer of this opinion was duly chosen to sit in the hearing and participate in the decision of this cause.

It is obvious that the basic question in this case is whether or not under the facts in this case, the Farmers & Traders Bank became bound to pay to the Platte Valley Bank the amount for which the latter bank held the third deed of trust in the sum of $1140. This obligation, if it exists, arises in one or both of two ways; first, by the terms of the deed from Mrs. Eiman to appellant, or, second, by a contract entered into by appellant and Mrs. Eiman at the time that deed was executed, the terms of which were not set forth in the deed. On the face of the deed, it merely appears that appellant took the lands in question ''subject to all encumbrances of record.'' Much of the argument of counsel, both orally and in the briefs, has been devoted to the question of whether or not appellant, by accepting a deed from Mrs. Eiman containing a clause providing that the grantee took the property in question ''subject to all encumbrances of record,'' thereby became personally bound to pay respondent's claims. A decision of this question is not necessary in this case. As will be pointed out later, the evidence shows that, independently of the provisions of the deed, appellant agreed to pay that debt. For that reason, Landau v. Cottrill, 159 Mo. 308, and similar cases cited by both parties, need not be considered here.

As stated, the property here involved was worth about $6500. The liens against it amounted to about $4300. The value of the equity deeded by Mrs. Eiman is thus shown to have been about $2200. However, when Bird became the holder of the first mortgage and foreclosed it he became the owner of both houses and lots, if the transaction were a valid one, and the appellant's equity and all three of the deeds of trust were totally destroyed. When Bird bought the $3000 first mortgage note, there were some unpaid interest and taxes, and he expended about $4300, which he apparently furnished, in paying for the note and in paying interest, taxes and the expenses incident to the foreclosure, including the $300 which he paid for the property at the foreclosure sale. Appellant claims that Bird was at this juncture the sole owner of the property, free and clear of all liens whatever. If so, he had reaped a clear profit of $2200, for that is the difference between Bird's outlay and the value of the property, $6500. At that time the appellant had neither gained nor lost anything, for it had simply surrendered a worthless note for $2800 in exchange for Mrs. Eiman's deed for her equity in the real estate,

and this equity had been lost to appellant when Bird foreclosed the first deed of trust as above set forth. It was while this state of affairs existed that Bird borrowed $2000 on each of the two houses, or a total of $4000, and gave his notes for that sum, secured by a first deed of trust on both houses and lots. Bird then owned an equity in the property amounting to $2500. He then deeded his equity in the property to appellant, by a quit-claim deed, consideration one dollar, and appellant assumed and agreed to pay the two notes aggregating $4000 above mentioned, and repaid to Bird the $300 which he had expended. At this stage, Bird's activities had profited him nothing and appellant, assuming the legality of all of these proceedings, had again become the owner of the property, valued at $6500, free and clear of all encumbrance, except the $4000 evidenced by Bird's two notes of $2000 each, which appellant had assumed and agreed to pay, and it had expended only the $300 which it had repaid to Bird. It had, however, surrendered its $2800 note. In other words, appellant had received $2200 for its $2800 note and the $1140 note, secured by the third deed of trust, had been eliminated. Bearing in mind that during all of this time Bird was a stockholder, director and member of the discount board of the appellant bank, and that the president of the appellant bank had stood idly by at the foreclosure sale, the question arises, did appellant and Bird act in collusion for the purpose of evading the payment of respondent's $1140 note? I think so. This course of conduct is susceptible of no other interpretation. If not, why did Bird donate his profit of $2200 to appellant? If not, why did appellant refund to Bird the $300 above mentioned? If not, why did appellant allow the interest on the first mortgage note to become and remain delinquent and thus furnish Bird with a valid reason for foreclosing that deed of trust? If not, why did appellant allow Bird to purchase for $300 at the foreclosure sale, property worth $6500 in which appellant owned an equity worth $2500? There is but one answer. Bird was acting throughout for appellant bank and both of them knew all about it. The fact that appellant assumed the payment of the two Bird notes, amounting to $4000 and that Bird himself, as he testified in a deposition, portions of which were read at the trial, did not profit by the transaction, is further evidence of a perfect understanding between appellant and Bird. Collusion existed. Now what was the effect of that collusion? All of this indirection was useless. Appellant is exactly in the position in which it would have been had it bought and foreclosed the $3000 deed of trust immediately after it had obtained the deed from Mrs. Eiman. If it had done so, would it have been bound to pay respondent the $1140 note? That would depend upon the terms of its contract with Mrs. Eiman. What was that contract? So far as the deed shows, appellant simply took the property "subject to all encumbrances of record." The consideration recited is "one

dollar and other good and valuable considerations." This record, however, reveals that there was a verbal "side agreement" between Mrs. Eiman and appellant. That agreement between Mrs. Eiman and the appellant was in addition to the recitals in the deed, and, whatever it may have been, was made in the presence of several witnesses, at the same time that her deed to appellant was executed. This meeting took place in the office of Mr. Shackelford. Four, and only four, persons were present; Mr. Shackelford, special counsel for appellant, Mr. Cornelius, president of the appellant bank, Mrs. Eiman and her brother, Mr. Vogel. Respondent introduced Mrs. Eiman and Mr. Vogel as witnesses. Mr. Shackelford testified in behalf of appellant. Mr. Cornelius did not testify. In substance, Mrs. Eiman testified that she agreed to deed her equity in the property in question to appellant in satisfaction of her note for $2800, and in addition, appellant was "to pay all the debts against the property, the taxes and the mortgages and the interest thereon." Respondent's note for $1140, secured by a deed of trust, duly recorded, was discussed, so Mrs. Eiman testified, and she further stated that "they agreed to take it that way," and threatened her with bankruptcy proceedings "if she did not sell it to them that way." On cross-examination, Mrs. Eiman testified that both she and her late husband were insolvent, that on the day after they had executed the $1140 deed of trust to respondent, June 26, 1922, her husband committed suicide; that she did not want the deed of trust to the respondent set aside; that appellant threatened to bring suit for that purpose; that appellant refused to accept a deed containing an express agreement on the part of appellant to assume and agree to pay existing encumbrances of record; that she signed a deed prepared by Mr. Cornelius containing a provision that the property was conveyed "subject to existing encumbrances of record;" that Mr. Cornelius told her that the deed he had prepared "meant about the very same thing as the deed" she had written; that what she meant was that the bank took the deed "subject to all encumbrances of record," and that this was to be done "by the bank agreeing to pay those mortgages of record."

Mr. Vogel corroborated Mrs. Eiman. Mr. Cornelius did not testify, although present at the trial. Mr. Shackelford testified, in substance, that at the meeting in his office Mrs. Eiman, Mr. Vogel, Mr. Cornelius and himself were present; that Mrs. Eiman presented a deed whereby the appellant would have assumed and agreed to pay all encumbrances of record, and that he then said to Mr. Cornelius, in the presence of Mrs. Eiman and Mr. Vogel, "That he should not accept a deed in which his bank assumed the payment of those other debts unless he was prepared to pay them and make them the bank's personal obligation, but that he could take a deed subject to mortgages of record, and that would cover any mortgages or deeds of trust that were on record, and he refused to accept the deed that assumed personal

liability for the prior encumbrances, but himself had drawn up and finally Mrs. Eiman executed a deed in which it was recited—that is the deed which was introduced in evidence—that this deed was taken subject to the prior other encumbrances and that she should have the rents up to a certain time." Mr. Shackelford denied that either he or Mr. Cornelius told Mrs. Eiman that the deed prepared by Mr. Cornelius was in legal effect the same as the deed Mrs. Eiman had prepared, but said he plainly pointed out the difference in the two deeds; that Mrs. Eiman wanted to avoid any suit to set aside respondent's deed of trust, and also wanted to avoid bankruptcy proceedings, and that there was a "side agreement," as he called it, in writing between Mrs. Eiman and appellant that appellant would not file such a suit nor institute bankruptcy proceedings if Mrs. Eiman would deed her equity to appellant, and that this "side agreement" was a part of the consideration for Mrs. Eiman's deed. The foregoing fairly presents the gist of the evidence for both parties on this point.

Now, in considering this testimony, certain obvious facts are worthy of note. Mr. Vogel had no pecuniary interest in this case. Mrs. Eiman, because of insolvency, had practically none. Neither was in the employ of either party to this action. Mrs. Eiman had surrendered everything for the purpose of paying the joint debts of herself and her late husband. Apparently she did not reserve even the exemptions allowed her by law. Her only interest lay in the payment of these debts and *all* of them. Admittedly, the deed does not express the real consideration for the conveyance. There was, as Mr. Shackelford testified, a written "side agreement." That agreement bound the appellant not to *"bring a suit to set aside"* the deed of trust which Mrs. Eiman and her husband had executed to the respondent bank. Appellant literally kept its word. It brought no such suit. It resorted to a foreclosure sale instead. It also appears from Mr. Shackelford's testimony, that when he was asked if appellant *had ever agreed to assume* the encumbrances of record above mentioned, he replied that appellant had *refused to accept a deed,* containing an assumption agreement. The answer was undoubtedly true, but it was not as broad as the question. No one contends that appellant made such an agreement by accepting a *deed* containing an assumption clause. But Mrs. Eiman and Vogel testified that appellant and Mrs. Eiman had a verbal "side agreement" to that effect. Mr. Shackelford did not directly deny it. Mr. Cornelius, the only other person present when this agreement was made, if it was made, did not testify. The result is that two witnesses swore there was such agreement, outside of the deed, and no one directly denied it. Mr. Shackelford's denial, in substance, was that he heard no reference to such a verbal agreement.

In its findings of law and facts the trial court said:

"Said encumbrances were understood and known to the defendant at that time, (i. e. at the date of Mrs. Eiman's deed to appellant), and constituted part of the purchase price of the premises. . . . In other words, the defendant bought the property subject to liens of record, and all it expected, or had a right to expect, was what was left, if anything, after said liens were satisfied."

The trial court had meat to eat that we know not of. It saw and heard the witnesses and was in a better position than an appellate court to weigh their testimony. The finding of the trial court on this question of fact is supported by substantial evidence and ought not to be disturbed. If appellant did in fact agree to pay respondent's debt as a part of the consideration for the deed from Mrs. Eiman, then the judgment below was correct on the facts. That it did so agree is clearly established.

Appellant, however, insists that the judgment should be reversed for the reason that the petition does not state a cause of action in equity. It claims that respondent had an adequate remedy at law and, for that reason, could not maintain an action in equity. It clearly appears on the face of the petition that the pleader meant to state an equitable cause of action. The defendant, appellant here, filed a general denial. It filed no other plea or motion. Neither by demurrer, motion to transfer to the common-law side of the docket, demanding a jury, not otherwise, did appellant question the propriety of hearing this cause as an equity suit. Its suggestion that this case should not have been heard as a suit in equity, comes too late. This case was tried on the theory that it is a suit in equity. No other theory can be considered here.

"We have but to say in regard to this point, that it was either a suit in equity, or the court committed an error in trying it without the intervention of a jury, but as it was treated by the court, and the counsel, on both sides, as an equitable proceeding, and so tried without objection from either side, without examining the numerous authorities cited by the counsel, we shall regard it as a suit in equity, but, inasmuch as for an error which will be presently adverted to, the judgment will be reversed and the cause remanded, we shall express no opinion as to the correctness of the finding of the court on the evidence." [Durdley v. McCluer, 65 Mo. 241, l. c. 242; See, also, Bruner v. Ingersoll-Rand Company, 233 S. W. 256, l. c. 259; Buchner v. Midland F. & L. Co., 190 S. W. 419, l. c. 420; Jones v. Silver, 97 Mo. App. 231, l. c. 241; Campbell v. Miller, 226 S. W. 597, l. c. 598; Peterman v. Peterman, 228 S. W. 1062, l. c. 1063.]

It appears that Earley Bird's deposition had been taken in this case. He was present in court at the trial, but did not testify. Respondent offered portions of his deposition in evidence. Appellant objected on the ground that Bird was present in court and that his admissions were not competent as against appellant. That objection was overruled. Appellant claims that this was reversible error. The

trial court found Bird was appellant's agent. In its findings of fact, the trial court said: "It is very clear that the sale under the deed of trust was managed by Earley D. Bird for the benefit of the bank and was really a bank transaction." There was very cogent evidence to support this finding of fact aside from Bird's deposition. The ruling of the court upon this point does not constitute reversible error, particularly in view of the fact that the portion of the deposition offered by plaintiff is of slight importance in any event.

The points decided are decisive of the case. The judgment should be affirmed. It is so ordered. *Arnold, J.,* concurs; *Bland, J.,* dissents in a separate opinion; *Trimble, P. J.,* **absent.**

BLAND, J. (dissenting).—I think a fundamental error inhering in the majority opinion in this case is the fact that it quotes from a part of the "conclusions of law" and mistakenly designates the quotation as from the findings of law and fact. The chancellor stated his conclusions of facts separately from the conclusions of law and the quotation found in the majority opinion is from the "conclusions of laws" and these conclusions are so headed in the abstract. However, under the heading "Findings of Fact by the Court," I find the following:

". . . The said deed recited a consideration of one dollar ($1) and other valuable consideration. The real consideration was the surrender of the $2800 note to Mrs. Eiman and the bank receiving the property subject to the liens of record.

"There was considerable controversy as to whether or not the defendant bank agreed to assume all the indebtedness against the property, or whether or not they bought it subject to other indebtedness. The deed recites that it was subject to all encumbrances of record and the court will take that view of it."

Under the findings of fact the court clearly found that the agreement made between Mrs. Eiman and defendant, when the deed dated October 30, 1922, was executed, was that the property was taken by defendant *subject* to all encumbrances of record as recited in the deed, and that there was no verbal agreement wherein defendant agreed to assume the indebtedness against the property.

The chancellor in his conclusions of law evidently labored under the same misapprehension that plaintiff has always done in this case by assuming that as the deed recited that the property was conveyed subject to all encumbrances, the legal effect of the instrument was to make the grantee liable on the theory that the encumbrances thus became a part of the purchase price. This is borne out by what was said by the chancellor in his conclusions of law, in addition and subsequent to that part first quoted in the majority opinion and in connection with an entirely different matter, as follows: "In other words, the defendant bought the property subject to liens of record and all

he expected or had a right to expect was what was left, if anything, after said liens were satisfied.'' I think that the finding of the chancellor that the contract between Mrs. Eiman and defendant was that the property was conveyed ''subject to all encumbrances of record'' and that there was no agreement on its part to assume the indebtedness, is borne out by the decided weight of the testimony. However, as this is an equity case we should defer to the findings of fact made by the chancellor, even though the weight of the evidence might seem to be slightly against such findings or we ourselves might have found otherwise. [Hunnell v. Zinn, 184 S. W. 1154, 1157.]

What the chancellor said in his conclusions of law is not important in this case, it is the findings of fact that should govern us, and the facts having been determined, we should arrive at our own conclusion as to the law. In a law case tried before the court where a request is made of the court to make findings of fact, under section 1402, Revised Statutes 1919, such findings so made by the court amount to a special verdict and is binding upon the appellate court the same as the verdict of a jury. [Rausch v. Michel, 192 Mo. 293; Barnett v. Hastain, 256 S. W. 750.]

Findings of fact and conclusions of law must not be confused for the reason, as before stated, conclusions of law are not binding upon the appellate court even though the court attempts to make some findings of fact therein. In a law case the findings of fact alone are binding. When the facts have been found by the trial court, the appellate court will arrive at its own conclusion as to the law of the case, if the findings of fact support the judgment, it will be affirmed, if not, the judgment will be reversed. [Nichols v. Carter, 49 Mo. App. 401; College v. Dockery, 241 Mo. 522, 560.] In equity cases findings of fact by the chancellor are not conclusive but are advisory only (Patterson v. Patterson, 200 Mo. 335; Walther v. Null, 233 Mo. 104, 110), as the appellate court has a right to arrive at its own conclusions as to the facts in such cases. But, as before stated, the appellate court will defer to the findings of the chancellor upon questions of fact if the evidence is disputed, but the conclusions of law of the chancellor are no more binding upon us in an equity case than such conclusions on the part of a judge in a law case. [Beyer v. Sechlenker, 181 S. W. 69, 71.] The finding by the chancellor that the agreement between Mrs. Eiman and defendant made when her deed to it was executed on October 30, 1922, was that the latter agreed to take the property merely subject to all encumbrances of record, seems to have been finally acquiesced in by plaintiff for in oral argument plaintiff's counsel stated, in answer to questions propounded by the court, that they stood squarely upon the recitals in the deed and were not relying upon anything else, it being the contention of plaintiff's counsel that a deed reciting that the property is taken subject to all en-

cumbrances of record is equivalent, in a court of equity at least, to a recitation that the property is taken by the grantee subject to all encumbrances *which the grantee assumes to pay*. Counsel for plaintiff stated in oral argument that unless the deed in this case was to be construed as obligating defendant to pay plaintiff's mortgage, that plaintiff had no case. From what I shall hereinafter say, it will become apparent that the deed from Mrs. Eiman to defendant, dated October 30, 1922, does not obligate defendant in terms to pay this mortgage.

As before stated, I am of the opinion that the finding by the trial court that the agreement between Mrs. Eiman and defendant was that the latter took the property subject to all encumbrances of record is borne out by the weight of the testimony. It appears from the testimony that after Mrs. Eiman and her husband gave to plaintiff its mortgage, and defendant received information of this fact, defendant sought to have such deed set aside either in a direct suit based on the insanity of Mr. Eiman or that undue influence was practiced upon him, or, in effect, so far as Mrs. Eiman was concerned, by bringing a proceeding in bankruptcy against her on the theory that she had given a preference to plaintiff within four months. It evidently was the idea of defendant that should this conveyance from Mrs. Eiman to plaintiff be successfully attacked, that the remaining equity in the property could be subjected to the payment of defendant's claim arising by reason of the existence of its unsecured note of $2800 signed by Mrs. Eiman and her husband.

Mr. Shackelford testified that Mrs. Eiman stated in the conversation, when defendant's mortgage was executed, that her husband had signed a deed of trust to plaintiff late one night and that she in order to relieve her husband—

". . . in that condition from the pressure that that bank (plaintiff) was bringing upon him, also signed it with him. I advised her that under those circumstances that she could have the deed of trust set aside, that it was obtained under duress. Well, she said that she entertained such feeling for her husband that she didn't want those matters gone into in court, and she said, 'Now, I will give you this deed in satisfaction of my note if you won't file a petition in bankruptcy and if you won't bring any suit to set aside the deed of trust to the Platte Valley Bank,' and that was agreed to."

It will be borne in mind that her husband committed suicide the day after he signed plaintiff's mortgage. Mrs. Eiman testified that she did not think that her husband was caused to commit suicide directly by plaintiff's requiring him to sign its mortgage but it "may have worried him;" that her husband was not "crazy" but committed suicide as the result of melancholia; that when she signed the mortgage to defendant, "I didn't want them to set the mortgage aside. They tried to make out that he was insane, but he was not

insane, he was melancholy. . . . He (Shackelford) tried to get me to say that he was crazy and that was the grounds that they was going to have to set this mortgage aside. That was what he told me down at the office."

It is true that she testified that there was a verbal agreement between herself and Cornelius that defendant should pay all debts against the property including plaintiff's mortgage. She further testified that Cornelius, on the advice of Shackelford positively refused to sign the deed prepared by her attorneys and brought by her to the defendant bank because it recited that defendant assumed the payment of plaintiff's mortgage; that Cornelius and Shackelford told her that defendant would take a deed from her reciting that the property was conveyed subject to all encumbrances of record and that such a deed was finally signed by her at the request of the defendant; that Cornelius said the two deeds were practically the same. Vogel corroborated Mrs. Eiman's testimony to the effect that the verbal agreement was that defendant was to pay plaintiff's mortgage, but that Cornelius refused to insert this clause in the deed because such a deed with such a recital would create a cloud on the title to the property, but that the two deeds, that is, the one providing that defendant assume to pay all mortgages including that of plaintiff, and the one which was finally signed merely reciting that the property was taken subject to mortgages "meant practically the same."

Shackelford's testimony flatly contradicted that of Mrs. Eiman and Vogel in which they said that there was a verbal understanding that defendant was to pay plaintiff's mortgage. I do not regard Shackelford's testimony as evasive or lacking in clarity or definiteness and, as I view it, Shackelford positively denied any verbal understanding such as testified to by Mrs. Eiman and Vogel. He stated that the sole and only "side agreement" was that defendant would not file a petition in bankruptcy and would not bring suit to set aside the deed of trust to plaintiff; that the agreement that no attack should be made upon the mortgage of plaintiff "was the only consideration that I heard referred to at all, and that was referred to in my presence;" that he explained to Cornelius in the presence of Mrs. Eiman, and apparently in the presence of Vogel, the difference between the recital in the proposed deed reciting that defendant would assume to pay the mortgages, and the one that was actually executed reciting that the property was to be conveyed subject to the encumbrances; that he explained that if the deed read in the former manner, the bank would have to pay plaintiff's mortgage but if in the latter, it would not be obligated to pay it. Shackelford denied that he said that if the proposed mortgage to defendant specifically named the debt and mortgage to plaintiff that a cloud on the title would be created. Shackelford testified "there is no such law as that. I did not" make such a statement.

It would appear from the testimony that Mrs. Eiman was insolvent and that she had no interest of a substantial pecuniary nature in seeing that plaintiff's mortgage was paid. Of course, being solvent, a nonpayment of her note of $2800 to defendant was not of moment to her of a material nature, but it may be assumed from this record that she had a certain sense of pride and that she did not want the deed to plaintiff attacked in court on the ground that her husband was insane or that undue influence was exercised over him by plaintiff, because "she entertained such feelings for her husband that she did not want those matters gone into in court." Neither did she want bankruptcy proceedings brought against her. It is quite evident that she desired plaintiff's mortgage taken care of and paid but there is nothing in the record to suggest that this desire was brought about by any feeling on her part of friendliness to plaintiff but the payment of all of the indebtedness of herself and husband was no doubt a matter of pride with her. It would appear that she executed the deed to defendant to avoid any contest in court involving a dispute over the sanity of her husband and that she did not want to be thrown into bankruptcy. · Bankruptcy is regarded as a disgrace by many people.

I think beyond any question that Mrs. Eiman wanted defendant to assume the payment of plaintiff's mortgage and so expressed that desire to defendant. I am firmly of the belief that defendant refused to enter into such an agreement. If defendant had been willing to make such a contract, there appears to me to be no reasonable explanation of its refusal to express such an agreement in the deed. Mrs. Eiman did not offer any such explanation and the explanation of Vogel does not seem convincing. Both of them positively testified that defendant refused to accept a deed reciting that it agreed to pay plaintiff's indebtedness. Shackelford positively testified that the only consideration for the deed was that expressed in the deed and the further agreement which he fully explained, that defendant would not bring any proceeding attempting to void the legal effect of the giving of the deed by Mrs. Eiman and her husband to plaintiff. I think that the testimony clearly sustains the findings of fact by the chancellor that the agreement was that the property was conveyed subject to all encumbrances of record and there was no express agreement that defendant assume the indebtedness against the property. It is true Cornelius did not testify but I think it should be stated that his deposition was taken and counsel for defendant drew the attention of the court and opposing counsel to this fact at the trial and stated that they had no objection to the deposition being read.

The agreement being that the deed was taken "subject to all encumbrances of record" the only question to be determined is as to the legal effect of such recital. Such an agreement does not, by itself,

obligate the grantee to pay existing encumbrances. I think that this question was fully settled in the case of Brooks v. Owen, 112 Mo. 251, 252, and cases cited. [See, also, Hiemanz v. Starck, 198 S. W. 447, 449.] The case of Landau v. Cottrill, 159 Mo. 308, is not in point for the reason as stated by the court, l. c. 319, in reference to the facts in that case, *"and the amount of that security was in fact a part of the purchase price for the premises."* In the case at bar, as before stated, there was no agreement that plaintiff's mortgage should be paid as a part of the purchase price of the property or otherwise. Consequently, defendant, through its agent, Bird, had a perfect right to shut out plaintiff's mortgage by bidding in the property at the foreclosure sale. Even though Bird had been acting for himself alone in bidding in the property, under the theory of this case adopted in the majority opinion, defendant would have been liable to plaintiff. So, assuming that plaintiff would not have discovered the agency of Bird, what difference would it make? I am, therefore, at a loss to understand the allusion, in the majority opinion, to "collusion" and "tortuous course of conduct" of the defendant and Bird.

In my opinion the judgment should be reversed and the cause remanded with instruction to the chancellor to dismiss the bill.