F. J. HANNE, PUBLIC ADMINISTRATOR, ETC., APPELLANT, v. ELSIE WATTERS, RESPONDENT.—47 S. W. (2d) 182.

Kansas City Court of Appeals.   February 29, 1932.

*Jesse H. Schaper, Randolph H. Schaper* and *L. G. Graf* for appellant.

*W. L. Cole* and *T. P. Hukriede* for respondent.

TRIMBLE, P. J.—This is a suit in equity filed May 22, 1930, by the administrator, with will annexed, of the estate of John W. Grannemann, deceased, in which he is seeking to set aside a judgment rendered at the August term, 1928, of the Probate Court of Gasconade county, Missouri, wherein an allowance was made of a demand in favor of defendant and against the estate of John W. Grannemann, deceased, for the sum of $3880. Said suit to set aside said judgment or allowance was based on the charge that the defendant represented to the Probate Court that said demand was founded upon a judgment for that amount of alimony in gross awarded to her in a divorce action between her and the deceased wherein she, under her then name of Elsie Grannemann, was awarded the divorce and said sum of alimony in gross, and falsely and fraudulently, and with intent to deceive and defraud the Probate Court and the estate of said

John W. Grannemann, deceased, did represent to said court that the said estate was indebted to her in that amount on said judgment for alimony, and did, by her false and fraudulent statements and representations made to the court at the hearing on said demand, and by means of the false and fraudulent allegations contained in said demand, procure the said judgment of allowance on her said demand against said estate in her favor of said sum of $3,880, when in truth and in fact, as defendant well knew, the said judgment of alimony was theretofore on the 12th day of April, 1924, in the lifetime of said John W. Grannemann, fully paid by him to defendant and the estate of said deceased was not indebted to· her in an amount. The petition alleged that plaintiff as administrator with ·will annexed had no notice, information or knowledge of said allowance of $3,880 in favor of defendant and against said estate in the probate court until long after the final adjournment of said August, 1928, term of said Probate Court, whereby he had no adequate remedy at law in the premises.

At the return day of the·summons on September 9, 1930, being the second day of the term, defendant filed her answer to the petition, wherein she admitted the death of John W. Grannemann; admitted that the estate was administered as plaintiff set out; that defendant presented her demand against said estate and it was allowed in the sum of $3,880; and defendant then denied each and every other allegation in said petition contained.

Thereafter at the September, 1930, term of said Circuit Court, the case was·tried upon the pleadings and the evidence adduced before the court sitting as a chancellor, and at the close thereof the court found the issues in favor of defendant and dismissed plaintiff's petition. From this, the plaintiff has duly appealed.

The record discloses that the defendant was formerly Elsie Grannemann, wife of John W. Grannemann, and from whom she obtained a divorce on the 13th day of May, 1922, in the Circuit Court of Gasconade county, in which she was awarded the care and custody of the six minor children ranging in age from the eldest, 16 years of age, to the youngest, 16 months old. In said decree of divorce defendant was awarded as alimony the sum of $60 per month to be paid by the defendant therein on the first day of each month, the first payment to be made on June 1, 1922, and to continue with a like payment on the first day of each month thereafter. John W. Grannemann died May 23, 1928, and shortly thereafter Henry J. Grannemann duly qualified as executor and took charge of said estate.

It was further shown in evidence that the executor named in the will, Henry J. Grannemann, was drowned in August, 1929, and thereafter the plaintiff, Hanne, public administrator, was appointed administrator, with the will annexed, of said John W. Grannemann's

estate and took charge thereof and of all the papers in said estate. He found no writing, among those papers, between Elsie Grannemann and John W. Grannemann in reference to a decree of divorce or of a settlement of alimony between them. He did not find among those papers any notice of a demand filed by Elsie Grannemann against said estate. The first time he learned that there was an allowance of $3,880 in favor of Elsie Watters against the estate of John W. Grannemann, deceased, was on November 29, 1929, when he was preparing to make a final settlement of said estate, and at that time he was advised not to pay it.

The plaintiff introduced L. R. Wentzel, who is, and was, clerk of the Circuit Court of Gasconade county, Missouri. He testified that he knew Elsie Grannemann and John Grannemann and had known them ever since the time of the divorce suit and up to the date of the latter's death; that "to the best of my memory I was present" when Elsie Grannemann signed her name to the release on the margin of the record of the judgment for alimony in gross in the divorce suit between the Grannemann's, said release being as follows:

"I, the undersigned, hereby enter satisfaction in full of the judgment for alimony on this page recorded. This 12th day of April, 1924. All accrued and to accrue alimony having been paid in full.

"ELSIE GRANNEMANN.

"Attest: L. R. WENTZEL."

Wentzel testified that he attested the release by signing his name thereto in her presence at the time therein stated; that he did not remember whether it was Mr. Graf or Mr. Ellis who was present when she signed the release, but one or the other of these men was present; that he did not remember which one of the men wrote the release. He was not sure in whose handwriting the release was, but if he was allowed to express an opinion he would say it was in Mr. Leander Graf's.

W. J. Ellis, a lawyer practicing at the county seat where this took place, testified that he had known John W. Grannemann since 1907 or 1908; that he had met Elsie Grannemann, his wife, now the plaintiff Elsie Watters a few times; that in April, 1924, or about that time, he attended to some business for them, with reference to the drawing of some papers between them relating to the acknowledgment of the satisfaction of a judgment in the Circuit Court of Gasconade county in a divorce case wherein there was a decree for alimony. He did not recall just what it was he did. He might not have drawn the paper himself, but anyway they came to his office and had such a paper writing and he and they went to the office of the clerk of the Circuit Court, Mr. L. R. Wentzel; that in said office Mr. Grannemann paid his divorced wife some money and he, witness, went and got the record book "in which this judgment was recorded."

When asked what judgment he referred to, he replied "For alimony that he was paying, and they agreed to settle it all and be done with it."

Upon an objection being made that he should state the words they used in making the agreement, he was asked:

"Q. Give as near as you can what they said, or the substance of it? A. The substance of it was in a paper writing, I don't know what it was, it was an agreement.

"Q. Did you see them sign any paper writing? A. Yes, sir.

"Q. What connection did that paper writing have with the satisfaction of this judgment in the case of Elsie Grannemann against John W. Grannemann, the divorce decree? A. The substance of the paper writing was copied on to that record there.

"Q. You referred a moment ago to the fact that you went to Mr. Wentzel's office and obtained the judgment record containing the record of the judgment in this case, was Mr. Wentzel present? A. Yes, sir, but the paper was signed in the Hermann Savings Bank.

"Q. The paper writing that you referred to? A. Yes, sir; at Mr. Meyer's desk.

"Q. Before or after the transaction in the clerk's office? A. Before the transaction.

"Q. You went up to the courthouse with them? A. Yes, sir.

"Q. Tell what took place in the clerk's office in the court house? A. They were in there and paid over the money, and I went and got the record in there and wrote this satisfaction there.

"Q. The entry on the margin? A. Yes, sir.

"Q. Read here in evidence by Mr. Wentzel? A. Yes, sir; and Mrs. Grannemann at that time signed it, and Mr. Wentzel attested it.

"Q. That was all done in the presence of Mr. and Mrs. Grannemann, and in the presence of the clerk and yourself? A. Yes, sir.

"Q. Was that all of the transaction that you remember? A. That is all I remember."

On cross-examination, the witness testified that he first met them that day in the bank, he was called there from the postoffice by Mr. Robein or someone; that "if I ain't mistaken we walked up to my office;" that they were there for awhile; and then came back to the bank; that he did not remember whether he wrote the paper or not, "but anyhow they signed the paper writing in the Hermann Savings Bank at Mr. Meyer's desk, he was president of the bank." Witness further said that he did not know, at the time of the trial, the amount of money Mr. Grannemann paid for the release of the judgment, but that he did know at the time it was paid. It was in the paper writing, but he did not remember what it was, but it appeared to him that it was $1000 though he said he was not "clear about that." When

asked who the woman was that was there with Mr. Grannemann, he replied, "It was this lady sitting here (indicating). I am almost positive. I think it was."

Mr. Robein, assistant cashier of the bank for forty years, testified that he remembered the time on or about April 12, 1924, when Mr. Grannemann and his divorced wife came to the bank and attended to some business in connection with the satisfaction of the judgment in the divorce granted her, that he had known the parties a long time before that; that later on he saw W. J. Ellis, the attorney, in the bank there; that witness met Mr. Granneman earlier in the morning and the latter told him he was making a settlement with his former wife who was coming on the train to meet him there, and he asked witness to do him a favor and draw up some papers for him, but witness refused and told Grannemann to get Mr. Ellis to write the paper. Grannemann knew Mr. Ellis and said that was all right, that as soon as Mrs. Grannemann arrived to call him over the 'phone and he would come down to the bank; that when Mrs. Grannemann arrived witness called Mr. Grannemann and he came down to the bank, and thereupon Mr. Grannemann, Mrs. Grannemann, his divorced wife, and Mr. Ellis "had quite a conversation."

"Q. What was the conversation about? A. That is a thing I am not going to testify. I know from John, but I didn't listen in on the conversation because I was busy. Then Mr. Ellis left and went back up to his office, and after a while he came back down to the bank again with some papers.

"Q. Where were the parties, Mr. and Mrs. Granneman, during Mr. Ellis' absence at his office? A. They stayed right in the bank building there.

"Q. And he came back, and then what took place between them? A. And then the three of them went into a little side office we have there in the bank, the lobby of the bank room, and they signed some papers, and then all three of them left. They went out of the bank's front door, and I didn't pay any further attention to them. But John had told me what the contents of the paper were to be.

"Mr. Cole: We object to that.

"The Court: Sustained.

"To which ruling of the court, plaintiff then and there duly excepted.

"Mr. Schaper: We offer to prove by this witness that John W. Grannemann told him in substance that he had made a settlement with his formed wife, Elsie Watters.

"Mr. Cole: We object.

"The Witness: He was making a settlement would be better.

"Mr. Schaper: Or was making a settlement.

"The Court: Sustained.

"To which ruling of the court, plaintiff then and there duly excepted."

The witness testified further that he, at that time, knew Mrs. Grannemann by sight, but wasn't intimately acquainted with her.

L. G. Graf testified on the part of the plaintiff, that he was an attorney at law practicing at Hermann for the past 15 years and knew Elsie Grannemann and John W. Grannemann, and represented the former throughout her divorce suit in the Circuit Court of Gasconade county in 1922; that, according to the divorce decree, he knew of the settlement between the parties of the real estate matters involved and had something to do with drawing up the transfers with regard to them.

Witness testified further that all he knew about any settlement between them of alimony matters, in the spring of 1924, was that he was coming from the postoffice and saw Elsie Grannemann coming down from the courthouse and crossing over to the shoe store at the corner there. Witness then testified as follows:

"Q. Did you speak to her? A. I spoke to her, and stopped, and waited for her to come over, and I remember saying to her, 'What in the world are you doing in town?' And as I was speaking with her, I saw Mr. Grannemann also coming down on the other side, but Mrs. Elsie Grannemann, now Watters, was ahead of him, and she and I met at the corner, and we talked, and I says, 'What in the world are you doing in town here?' And she says, 'Oh, I came up on this morning's train. We looked for you and couldn't find you, so we got Mr. Ellis. We made a full settlement of everything.' There was at that time no confidential relation of attorney and client, and she told me they had made a full settlement and Mr. Grannemann paid her off in full. That he wanted it settled, and she did too, and she had received and accepted $1,000 in full settlement for all alimony, past and in the future. That was all I know about their settlement."

Witness further testified that he was the legal adviser of Henry Grannemann as executor of the will of John W. Grannemann, deceased; that he made diligent search through all of deceased's papers for the settlement paper in relation to the alimony, but it was missing and it could not be found. He did not know, of his own knowledge, who had access to deceased's papers after his death.

On cross-examination, witness Graf testified that he learned of the demand against the estate on August 14, 1929 (which was a year after its allowance by the Probate Court); that this was the first time he knew of it, and was when they went to make a settlement of the estate and his attention was by the probate judge called to the demand of $3880 that had been allowed. This was before the executor Henry Grannemann died. Later, the witness testified in effect that he was mistaken as to the date being August, 1929, and its being be-

fore Mr. Henry Grannemann's death; that it was perhaps in February, 1929, that he learned of the demand, but he didn't remember whether it was February or not, but the probate judge told him, "You are done, you can't do anything."

H. L. Stolte, judge of the Probate Court of Gasconade county, testified for the plaintiff as follows:

That he has been such judge for the past six years and in charge of the files in the estate of John W. Grannemann, deceased.

He identified the demand that was filed in support of the allowance of $3880 now in question. He testified that the demand was filed July 10, 1928; that the following is the demand presented by the defendant for allowance:

"*In the Matter of the Estate of John W. Grannemann, Deceased.*

"Comes now Elsie Watters who presents and files a demand for allowance against the estate of John W. Grannemann, deceased, in the sum of $3,880 said demand being founded on a judgment for alimony rendered against deceased, and in favor of this claimant service having been had upon the executor of this estate, and notice served upon him to appear in court on this day, but appeareth not, and this cause now being submitted to the court for trial, the court having heard the evidence in proof of said demand, and the defendant not appearing, it is ordered that the same be allowed against said estate in the sum of $3,880 same being $60 per month alimony from January 1, 1923, to May 23, 1928, a period of five years, four months and twenty-three days, together with costs and interest, and that the same be assigned to the 4th class of demands."

Witness further testified that he made the certificate on the back of the demand, as follows:

"$3,880 allowed on the within demand this 27th day of August, 1928, with 6% interest from date, assigned to 4th class. H. L. Stolte, Judge of Probate."

Witness further testified that on said 27th day of August, 1929, Elsie Watters (defendant herein) appeared in court with another lady and they both testified; that one of the two lawyers present with her had a paper writing which he read and "probably handed" to the probate judge. As near as witness could recall, the paper "was the decree of the Circuit Court in regard to that judgment;" that the said paper purporting to be a certified copy of the judgment for divorce and alimony was the one presented to him, the probate judge, at the hearing had on the demand. (The certified copy is set out in full in the record in the case at bar, but the date of its certification is not shown nor, so far as anything appearing thereon or thereto, was the decree in fact certified to.)

The witness testified that no paper was attached to, or formed a part of, the exhibit presented to him at the hearing on the demand; that the exhibit was just as it was at the trial of this cause. Witness also testified that he *had no knowledge,* either from the testimony offered on the occasion of the hearing on the demand, or from the papers themselves, that the *judgment,* of which the exhibit is a copy, *had been satisfied of record;* nor had the probate judge any knowledge or information of any record entry on the margin of the judgment record showing satisfaction of said judgment; that said probate judge did not know, and had no reason to know, of any such marginal release, until the filing of plaintiff's motion in the probate court to set aside such judgment allowing the demand; that the practice and procedure in the Probate Court has always been never to allow any demands that were not verified by affidavit, and this one would not have been allowed had it not been verified by either the demandant or her agent.

(The demand and affidavit were in the usual and ordinary form, the latter being signed and sworn to by claimant's agent and attorney.) The demand reads as follows:

"Demand.

"The Estate of John W. Grannemann, deceased,

"To Elsie Watters, Dr.

"To judgment for alimony at the rate of $60 per month from Jan. 1, 1923 to May 23, 1928, or 5 yrs., 4 months and 23 days ...$3,880.00."

Attached to the demand was a notice of claim addressed "to Henry J. Grannemann, executor of the estate of John W. Grannemann, deceased," reading as follows:

"Take notice, that on the first day of the next regular term, of the Probate Court, held in and for Gasconade county, and State of Missouri, I shall present for allowance against the estate of John W. Grannemann, deceased, a claim for the sum of thirty-eight hundred and eighty dollars, and ____ cents, founded upon a judgment of which demand the attached is a copy."

This notice was signed with the name of Elsie Watters by her attorney. The return of service was as follows:

"Return of Service.

"Served the within notice on the 9th day of July, 1928, in the County of Gasconade, by delivering a true copy of the same to the herein-named Henry J. Grannemann.

"AUGUST EBERLIN,
"Sheriff,
"By JOE WUNDERLICH,
"Deputy Sheriff."

The probate judge further testified that no other transcript of the proceedings in the Circuit Court was introduced or submitted to

the Probate court, nor any judgment record book of the clerk of the Circuit Court of Gasconade county in the divorce case.

On cross-examination, the probate judge testified that defendant then Mrs. Watters, testified on the witness stand, but what she testified to was objected to by plaintiff's counsel on the ground that she was not a competent witness to testify at the hearing on the demand or to give any testimony as to any settlement which would bind the plaintiff in the case at bar. This was overruled. The witness, however, was unable to recall just what she said at the hearing.

Witness further testified that in February, 1929, Mr. Graf accompanied by Henry J. Grannemann, the executor, came to his office to make a settlement and proceeded to do so in the outer office when Graf discovered the allowance of the demand, and the settlement could not be made, and the settlement was continued to the May term, 1929, and on February 26, 1929, they filed a motion to set aside the judgment allowing the demand which was overruled the same day.

This, in substance, was all of the testimony offered by plaintiff.

The defendant was introduced and testified, in her own behalf, that she lived at Washington, Missouri, and formerly was Mrs. Grannemann, the wife of John Grannemann from whom she was divorced on May 13, 1922, that she received $60 a month alimony from the 1st of July, 1922, until January 1, 1923. She denied ever meeting her ex-husband at the courthouse in Hermann at which she signed any papers after January 1, 1923; that she was not with her ex-husband on or about the 12th day of April, 1924, but at that time was living at Washington, Missouri; that she did not sign the marginal release of the judgment nor did she know who did sign it. She denied she met her former husband at the courthouse on or about April 12, 1924, when William J. Ellis and L. R. Wentzel the clerk were there, in reference to a settlement of her alimony. She testified she was not in Hermann that day, nor any time about that day either before or after. She knew William J. Ellis, the attorney at Hermann when she saw him. So did not know Mr. Robein, the assistant cashier of the Hermann Bank, but didn't "remember of meeting him on that occasion." She knew L. R. Wentzel, the clerk of the Circuit Court. She also testified that she knew Mr. L. G. Graf of Hermann, Missouri, but denied that she met him in Hermann at or near the shoe store mentioned in evidence on or about April 12, 1924, or that she spoke to him. "I did not. My memory is good, and always has been. I am forty-one years old."

She was shown the signature to her petition in her divorce case and also the signature to the affidavit to said petition and denied that they were her signatures. She was asked if she could write and said, "Oh, yes, sure I can;" she reiterated her denials of meeting her former husband on April 12, 1924, and of receiving anything from

him. She said the last time she got a payment of alimony from him was January 1, 1923. When asked, "Q. How did it happen that you kept quiet so long, and made no claim for any alimony? A. Because I thought he was man enough to give it to his children." She denied that she called to see her former husband in his last illness or that she called at the place where he died after his death. She stated that she did not call at the office or place where he died, his usual place of abode, nor examine his papers, nor find the paper referred to in the evidence as the paper for the settlement of alimony, nor did she have any such paper in her possession; that she never signed any such paper in full satisfaction and release of the judgment for alimony. She admitted she filed a petition for divorce and obtained a divorce, but denied that she signed her name to any paper in connection with the divorce suit. When finally she was asked on cross-examination, "Do you mean to tell the court that you did not sign that?" (showing her the petition in the divorce suit), she replied, "I tell the court I did not sign that."

But on re-direct examination by her counsel when asked if she did not swear to her petition before a notary public, and it was stated to her "that is your petition for divorce" and was asked, "Is that your signature to it at the bottom?" she replied, "A. Yes, sir, that is my signature."

"Q. That is the one you told Judge Schaper (who had cross-examined her) was not your signature? A. Well, I didn't know what it was when he asked me that."

On re-cross-examination by Mr. Schaper, the testimony was as follows:

"Q. Referring to your signature to your petition for divorce in the Circuit Court of Gasconade county, you know your signature, whether I ask you that question, or whether your attorney asked you, doesn't make any difference, does it? A. Yes, that is my signature on there.

"Q. How do you explain to the court that you told the court on two different occasions on my cross-examination that was not your signature, what do you mean by that? A. I did not look at it right.

"Q. Look again at the record of the decree of divorce rendered in the Circuit Court of Gasconade county, Missouri, on the 13th day of May, 1922, in the case of Elsie Grannemann, against John Grannemann, defendant, and particularly the marginal entry, and particularly at the name, what purports to be the name of Elsie Grannemann, look at that—you told me on cross-examination that was not your signature, what do you say now? A. That is not my signature.

"Q. Again referring to Plaintiff's Exhibit B, exhibited to you before, that which purports to be your signature to your petition in said divorce case, will you point out to the court if there is any

difference between those signatures, the one on the petition and the one on the marginal entry of the judgment? A. Yes, I see a difference.

"Q. What is the difference? A. The names are not written alike.

"Q. In what way? A. Anybody could see that.

"Q. You point it out? A. There is a difference.

"Q. What is the difference? A. The E is different.

"Q. Is that the only difference? A. The G's are different.

"Q. In what way are they different? A. This one is made—

"Q. (interrupting) Referring to the signature on the petition, · in what way is it different? A. Well, there is quite a difference as far as I can see.

"Q. What is the difference? A. This is better writing than this.

"Q. Referring to the judgment, that is better writing? A. Yes, sir.

"Q. Is that the only answer you choose to make? A. Yes, sir.

"And this was all the evidence in the case."

It will be observed that the evidence introduced in plaintiff's behalf was given by witnesses apparently in no wise interested and wholly unimpeached, and that evidence is supported by court records of the most solemn character; to all of which defendant has interposed nothing but her own bare denial and her unsupported assertion that plaintiff's evidence is untrue. So that the great, if not the overwhelming, weight of the evidence supports the essential allegations of the petition, to-wit: that the debt represented by the decree of alimony was settled in full during the former husband's lifetime, but notwithstanding that fact, the defendant, with the design and intent to defraud his estate, presented what she knew was a fictitious demand and procured the exercise of the probate court's jurisdiction thereover, by means of a false affidavit caused to be made by her agent and attorney, without disclosing to the latter the true facts in the case, by which means and practice it was intended to deceive, and in fact did deceive, the probate court and sought to deceive the executor then in charge of said estate. This amounts, in our view, to fraud in the very concoction and procurement of the judgment in defendant's favor and against the estate in the probate court.

Defendant knew that the alimony decree was settled in full during the decedent's lifetime.

A demand, know by the claimant to be fictitious and of no further vitality, was presented and the court's exercise of jurisdiction was procured by means of a false affidavit made without disclosing the true fact that the debt had been settled in full, this was done necessarily with the design to defraud and deceive both the executor and the court. There was submitted to the court in support of the judgment sought a *certified copy* of the original decree which certified

copy was made apparently at some time before the marginal release was placed thereon, instead of submitting the *original record* of the decree, which was then, and at all times has been, in the same building or courthouse and easily accessible, but which would have at once disclosed the mariginal release showing that the defendant's claimed demand was, in fact, no demand at all. The testimony given by the defendant is not reconcilable with the impartial evidence and clearly established facts, and hence must be rejected. [Chamberlain v. Ward, 21 How. 548, 561; 1 Moore on Facts, sec. 7, p. 11.]

A necessary prerequisite to the exercise of the probate court's power to allow a demand against an estate is the filing of an affidavit by claimant that she has given credit to the estate for all payments or offsets to which it is entitled, and that the balance claimed is justly due. [Secs. 193, 194, R. S. Mo. 1929.] And when the holder of a satisfied claim or debt makes a false affidavit that it has not been paid, and fraudulently procures its allowance, such allowance may be set aside in equity. [Fitzpatrick v. Stevens, 114 Mo. App. 497, 502, and cases there cited.]

A suit in equity can be used to annul allowances of the probate court shown to have been obtained by fraud upon the court, and the remedy at law given by section 212, Revised Statutes Missouri 1929, is not preclusive. [Peters v. Schultz, 300 Mo. 324; Walther v. Null. 233 Mo. 104.]

This being an equity case, it is the duty of this court to review the evidence and make its own findings. We are not concluded by the finding of the trial court. Of course, when there is conflicting and rather evenly balanced evidence, but there is enough of substance to support the findings of the chancellor, we should defer to his view of the matter. [Neville v. D'Oench (Mo. Sup.), 34 S. W. (2d) 491; Twedell v. Treasure, 44 S. W. (2d) 216, 227.] But the evidence in this case, as heretofore stated, is far from being in that situation. Indeed, it is so far the other way that it clearly fails to support the finding and judgment of the trial court. Hence the court erred in dismissing the plaintiff's suit and in rendering judgment for defendant. Consequently, the judgment of the chancellor is reversed and the cause remanded with directions to set aside the judgment of the probate court allowing the said demand. All concur.